**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **CR-07-122ML** |
| | : | |
| | : | |
| **DOMINGO ENRIQUE LORENZO-FERRERA** | : | |

**GOVERNMENT'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS**

## INTRODUCTION

The defendant, charged with being an aggravated felon illegally in the United States following deportation, seeks suppression of his identification, his fingerprints, and his "A-file". As grounds therefore, he argues that the August 6, 2007 stop by police of the vehicle in which he was riding, which ultimately led to confirmation that he is a previously deported alien unlawfully in the United States, was not supported by reasonable suspicion.

The defendant is simply wrong. The officers who stopped the vehicle had ample reasonable suspicion that an occupant of the vehicle was unlawfully in the United States. Furthermore, even assuming that the stop was not a proper Terry stop, the defendant is not entitled to the relief he seeks. Neither his identity, i.e., who he is, nor his "A-file" may be suppressed as

a result of any alleged Fourth Amendment violation. With respect to fingerprint evidence, the most he is entitled to if a Fourth Amendment violation occurred is suppression of the set of fingerprints taken by United States Bureau of Immigration and Customs Enforcement ("ICE") agents on August 6, 2007. He is not entitled to suppression of a second set of fingerprints taken by the United States Marshal Service following his indictment on the illegal reentry charge presently before the Court.

**FACTS**

In July and August of 2007, Rhode Island State Police Detective and Special Federal Officer Matthew C. Moynihan received information from not one, but two informants that a Dominican man was distributing drugs in the Providence area, and that this man was in the United States illegally. Detective Moynihan knew both informants personally; in other words, neither informant was an anonymous tipster. The information provided by the two informants with respect to the Dominican man was virtually identical. Both informants told Detective Moynihan that the Dominican man traveled from Providence to New York to pick up kilogram quantities of cocaine to bring back to Providence. The first informant, who had previously provided information that had led to drug arrests and convictions, told Detective Moynihan that the Dominican man resided at the left

first floor apartment at 174 Linwood Avenue in Providence. The second informant likewise informed Detective Moynihan that the Dominican man resided in the first floor apartment at 174 Linwood Avenue. The first informant described the Dominican man as a short, bald man in his fifties. The second informant described the Dominican man as short, bald, older, and heavy-set. The first informant told Detective Moynihan that the Dominican man had been deported from the United States after serving time in prison on drug related arrests. The second informant likewise advised Detective Moynihan that the subject was in the United States illegally.

On August 6, 2007, while conducting surveillance of 174 Linwood Avenue, Detective Moynihan observed a short, bald, older, heavy-set Hispanic male exit the left first floor apartment at 174 Linwood Avenue. The man got into the passenger side of a grey Ford Taurus, which then looped around and parked in front of 174 Linwood Avenue. Detective Moynihan then observed the short, bald, older, heavy-set Hispanic male get out of the car, and, along with the driver, enter the left first floor apartment at 174 Linwood Avenue. A short time later, Detective Moynihan observed the short, bald, older, heavy-set man and the driver exit the left first floor apartment at 174 Linwood Avenue, and get back into the Ford Taurus.

The Ford Taurus was subsequently stopped by Detective Moynihan and other members of law enforcement. When asked for identification, the short, bald, older, heavy-set man provided an obviously fake New York Identification Card identifying him as "Felix Lorenzo". The man was taken to ICE headquarters and fingerprinted; that fingerprinting led to his identification as the defendant, Domingo Enrique Lorenzo-Ferrara, an aggravated felon previously deported from the United States. Following his indictment by a federal grand jury for violation of Title 8, United States Code, Section 1326(a), i.e., illegal re-entry, the United States Marshalls took another set of fingerprints as part of their routine booking procedure.

**ARGUMENT**

**I. THE STOP OF THE CAR IN WHICH DEFENDANT WAS A PASSENGER WAS A VALID STOP SUPPORTED BY REASONABLE SUSPICION**

Pursuant to Terry v. Ohio, "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." United States v. Trueber, 238 F.3d 79, 91 (1st Cir. 2001) (quoting Terry, 392 U.S. 1, 22 (1968)) (internal quotations and citations omitted). The officer may "stop and briefly detain the person for investigative purposes, and

diligently pursue a means of investigation likely to confirm or dispel [his] suspicions quickly." Id. These "investigatory powers include stopping motor vehicles upon reasonable suspicion." United States v. Taylor, 162 F.3d 12, 18 (1st Cir. 1998) (citing Michigan v. Long, 463 U.S. 1032, 1049 (1983)).

To justify such a stop, "'the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion.'" Taylor, 162 F.3d at 17 (quoting United States v. Kimball, 25 F.3d 1, 6 (1st Cir. 1994)(quoting Terry, 392 U.S. at 21)). Put another way, "[w]arrantless investigatory stops are allowable if, and to the extent that, police officers have a reasonable suspicion of wrongdoing - a suspicion that finds expression in specific, articulable reasons for believing that a person may be connected to the commission of a particular crime." United States v. Lee, 317 F.3d 26, 31 (1st Cir. 2003) (citing Terry, 392 U.S. at 21). "A determination of whether [a] stop was justified at its inception depends on the totality of the circumstances confronting the officer." United States v. Trullo, 809 F.2d 108, 111 (1st Cir. 1987).

That a suspect's conduct may be ambiguous does not render a stop invalid; "Terry recognized that the officers could detain the individuals to resolve the ambiguity." Illinois v. Wardlow,

528 U.S. 119, 125 (2000). Indeed, "[i]n allowing such detentions, Terry accepts the risk that officers may stop innocent people." Wardlow, 528 U.S. at 126. As the First Circuit has observed, "[t]he Supreme Court has 'looked favorably upon a practical, commonsense approach to the issue of reasonable suspicion.'" Taylor, 162 F.3d at 19 (quoting United States v. Sowers, 136 F.3d 24, 28 (1st Cir. 1998)).

It is well-settled in this Circuit that an investigatory stop may properly be based on information provided by a known, reliable informant. Taylor, 162 F.3d at 18-20. In upholding just such a stop in Taylor, the First Circuit relied on the Supreme Court's 1972 decision in Adams v. Williams, 407 U.S. 143 (1972). In Adams, the First Circuit in Taylor noted, the Supreme Court had upheld a stop based simply on information provided by a known and reliable informant, notwithstanding that the information had not been verified or corroborated by the officer making the stop. In Adams, the First Circuit observed,

> a person known to an officer approached the officer and informed him that an individual seated in a nearby vehicle was carrying narcotics and had a gun at his waist. The officer approached the car, tapped on the window, and asked [the defendant] to open the door. When [the defendant] instead rolled down the window, the officer reached into the car and removed a loaded revolver from [the defendant]'s waistband. The gun had not

> been visible to the officer from outside the car, but it was located in precisely the place indicated by the informant. [The defendant] was arrested for unlawful possession of the revolver. A subsequent search of the car revealed a large quantity of heroin. The Supreme Court held that the officer had acted justifiably in responding to the informant's unverified tip. The Court emphasized that the informant was known personally to the officer and "had provided him with information in the past." The Court noted that informants' tips may vary greatly in their value and reliability, but went on to state that "when a credible informant warns of a specific impending crime . . . the subtleties of the hearsay rule should not thwart an appropriate police response."

Taylor, 162 F.3d at 18-19 (citing Adams, 407 U.S. at 146-47)(emphasis added)(internal citations omitted).

The First Circuit's decision in United States v. Allston, 112 F.3d 32 (1st Cir. 1997) is even more instructive, given the similarity between the facts of that case and the facts here. In Allston, police received a tip from an informant that a man near a particular address was carrying a gun. 112 F.3d at 33. The informant gave a physical description of the man. Id. Police responded to the location, and observed a man matching the description provided by the informant. Id. The police then stopped the man, and recovered a firearm on his person. Id. After the District Court denied his motion to suppress, the

defendant appealed. The First Circuit, citing Adams, held that because the informant had given reliable information in the past, and because police had found a man matching the informant's description at the location given by the informant, the District Court's finding that the stop was supported by reasonable suspicion was "clearly correct."[1] Id. at 34.

Indeed, if for no other reason than to put the facts of this case in context, it is worth noting the First Circuit has upheld a Terry stop based on information provided by one informant known to police but who had no previous track record of providing reliable information. United States v. Romain, 393 F.3d 63, 70-74 (1st Cir. 2004). In Romain, the First Circuit held that stops based on information provided by such informants comport with the Fourth Amendment because when an informant is known to and speaks with police directly, such "a face-to-face encounter can afford police the ability to assess many of the elements that are relevant to determining whether information is sufficiently reliable to warrant police action." Romain, 393 F.3d at 73. The Court further noted that "[i]n-person

[1] In Allston, the police maintained that as they approached the defendant to conduct the stop, the defendant moved his left hand in the direction of his coat pocket. 112 F.3d at 33. The defendant denied this. Id. at 33. Whether he did or he didn't had no impact on the decision on the motion to suppress; the District Court ruled that even assuming that the defendant's version of events was accurate, the police still had reasonable suspicion to conduct a Terry stop. Id. at 34.

communications also tend to be more reliable because, having revealed one's physical appearance and location, the informant knows that she can be tracked down and held accountable if her assertions prove inaccurate." Id. Other circuits have reached the same result. United States v. Singh, 363 F.3d 347, 355 (4th Cir. 2004)("an unverified tip from a known informant may alone justify a reasonable suspicion of criminal activity"); United States v. Valentine, 232 F.3d 350, 354-55 (3d Cir. 2000)(same); United States v. Christmas, 222 F.3d 141, 144 (4th Cir. 2000)(same).[2]

Viewed against this legal backdrop, this is not even a close case. Here, there were not one, but two informants who had advised Detective Moynihan that a short, bald, older Dominican man who resided at the first floor apartment, 174 Linwood Avenue, Providence, was in the United States illegally. Like the informant in Allston, one of the informants here had a track

---

[2] Indeed, the reasonable suspicion required for a Terry stop may even be based on information received from an informant who has no track record of reliability and whose identity is completely unknown, i.e., an "anonymous tipster." Taylor, 162 F.3d at 18. Information received from an anonymous tipster requires additional corroboration by police in order to support a Terry stop, because "unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity'". Florida v. J.L., 529 U.S. 266, 270 (2000) (quoting Alabama v. White, 496 U.S. 325, 329 (1990))(emphasis added).

record of reliability; he had previously provided information that had led to the arrest and conviction of individuals for drug crimes. Both informants here were known to Detective Moynihan, and thus, like the informant in Romain, they knew "that [they could] be tracked down and held accountable if [their] assertions proved inaccurate." 393 F.3d at 73.

Furthermore, the two informants corroborated each other in that they provided virtually identical information concerning the short, bald, older Dominican male ultimately identified as the defendant. Both informants advised Detective Moynihan that the defendant traveled to New York to bring drugs back to Providence for distribution. Both informants advised Detective Moynihan that the defendant lived in the first floor apartment at 174 Linwood Avenue in Providence. Both informants advised Detective Moynihan that the defendant was an older, short, bald Dominican male, and that he was in the United States illegally. Like the officers in Allston, Detective Moynihan corroborated some of the information provided by the informants: he found a person matching the description provided by the informants at the location where the informants said he would be. Specifically, while watching 174 Linwood Avenue on August 6, 2007, Detective Moynihan observed a short, bald, older, and, as one informant had described, heavy-set, Hispanic man enter

and/or exit the first floor apartment at 174 Linwood Avenue three times.

Accordingly, when Detective Moynihan observed the short, bald, older, heavy-set Hispanic man described by the informants get into to the Ford Taurus on August 6, 2007, he had reasonable suspicion that the man was present in the United States in violation of federal immigration laws. He was therefore justified in briefly stopping the vehicle to confirm or dispel his suspicions.[3] The defendant's motion to suppress should be denied.

## II. EVEN ASSUMING ARGUENDO THAT THE STOP WAS NOT SUPPORTED BY REASONABLE SUSPICION, THE DEFENDANT IS NOT ENTITLED TO THE RELIEF HE SEEKS

The defendant claims that, as a result of the purportedly unconstitutional stop, he is entitled to suppression of his "identification, his fingerprints, and the government's use at trial of his 'A-file'", which contains documents maintained by ICE concerning, among other things, the defendant's citizenship

[3] As noted, Detective Moynihan is a sworn Special Federal Officer assigned to the HIDTA Task Force, consisting of federal, state and local law enforcement officers. Yet even simply in his capacity as a Rhode Island State Police Detective, the investigation of violations of federal immigration laws is well within his authority. State and local law enforcement "have the general authority to investigate and make arrests for violations of federal immigration laws." United States v. Vasquez-Alvarez, 176 F.3d 1294, 1296, 1299 n.4 (10th Cir. 1999).

and his deportation from the United States as an aggravated felon on January 26, 1995. The defendant's request for relief is overbroad. As set forth below, the most that he may be entitled to is suppression of the first set of fingerprints, taken by ICE Special Agents after his detention on August 6, 2007.

**A. The Defendant's Identity Cannot Be Suppressed**

First, it is well-settled that a defendant's identity cannot be suppressed, regardless of whether discovery of the defendant's identity was the result of an unlawful stop or arrest. Indeed, the first case that the defendant cites, United States v. Olivares-Rangel, 458 F.3d 1104 (10th Cir. 2006), stands for this proposition. In Olivares-Rangel, the Tenth Circuit held that under the Supreme Court's decision in INS v. Lopez-Mendoza, 468 U.S. 1032 (1984), an illegal reentry defendant can never challenge the court's jurisdiction over him based upon a Fourth Amendment violation. 458 F.3d at 1112. Similarly, the Ninth Circuit in an illegal reentry case has held that "the simple fact of who a defendant is cannot be excluded, regardless of the nature of the violation leading to his identity." United States v. Del Toro Gudino, 376 F.3d 997, 1000-01 (9th Cir. 2004). The Fifth Circuit is in agreement. United States v. Roque-Villaneuva, 175 F.3d 345, 346 (5th Cir. 1999)("Even if the

Defendant was illegally stopped, neither his identity nor his INS file are suppressible."). So are the Sixth and Third Circuits. United States v. Navarro-Diaz, 420 F.3d 581, 588 (6th Cir. 2005)("[T]he Supreme Court's holding in Lopez-Mendoza mandates that [the defendant's] motion to suppress his identity be denied, regardless of whether this information was obtained in violation of his Fourth Amendment rights."); United States v. Bowley, 435 F.3d 426, 430-31 (3d Cir. 2006)(identity may not be suppressed because "we doubt that the [Supreme] Court [in Lopez-Mendoza] lightly used such a sweeping word as 'never' in deciding when identity may be suppressed as the fruit of an illegal search or arrest.").

**B. At Most, Only The Defendant's First Set Of Fingerprints May Be Suppressed**

While a defendant's identity cannot be suppressed, some courts have held that identity-related evidence, such as fingerprint cards, in some instances may be suppressed if they are obtained as a result of unlawful stops or arrests. The circumstances under which such identity-related evidence may be suppressed is hardly settled, however; indeed, how this issue is handled appears to vary from circuit to circuit.[4] In Olivares-Rangel, for example, the Tenth Circuit held that fingerprints

[4] The government has been unable to find any First Circuit authority on point.

may be suppressed where the illegal arrest is made solely to obtain prints and then use those prints to link the defendant to past criminal activity, but suppression is not warranted where fingerprints are taken simply to "to connect [the defendant] to his immigration record and prior criminal record." 458 F.3d at 1112-1116. Taking a somewhat different approach, the Ninth Circuit, in another case cited by the defendant, has held that where fingerprints are obtained as a result of an illegal arrest, those fingerprints must be suppressed in an illegal reentry prosecution. United States v. Ortiz-Hernandez, 427 F.3d, 567, 576 (9th Cir. 2005). The defendant here can take little comfort from this decision, however, because the Ninth Circuit further held that even if the first set of fingerprints must be suppressed, the government may compel the defendant to provide a second set of fingerprints, and may use those prints in an illegal reentry prosecution:

> The government may now bring [the defendant] to trial on the illegal reentry indictment and compel him to submit to another fingerprinting based on that arrest and arraignment and use the evidence for purposes of identification at trial.

427 F.3d at 577. The Court further stated:

> Admittedly, our holding here limits the theoretical effect of suppressing the initial set of wrongfully obtained fingerprint exemplars, but this result is compelled by the nature of the evidence [the defendant] is seeking to suppress -- who he is. The Supreme Court has rejected applying the exclusionary rule to an individual's identity. With or without the second set of fingerprint exemplars, it is [the defendant's] insuppressible identity, along with his continued illegal presence in this country, that connects him to the charged crime. It is true that the government would not have known [the defendant's] true identity without having unlawfully taken the first of fingerprints, but that harm has no remedy under our case law beyond suppressing the initial fingerprints.

427 F.3d at 578. In further support of its holding, the Court emphasized the nature of the charge against the defendant -- "the continuing violation of federal law by his ongoing illegal presence in the United States." Id. The Court observed, "a constable's 'blunder may allow the criminal to go free, but we have never suggested that it allows the criminal to continue in the commission of an ongoing crime.'" Id. (quoting Del Toro Gudino, 376 F.3d at 1002)(quoting Lopez-Mendoza, 468 U.S. at 1047)).

**C. The Defendant Is Not Entitled To Suppression Of His "A-File"**

With respect to the defendant's "A-file", the weight of authority holds that a defendant in an illegal re-entry case is not entitled to suppression of that file, notwithstanding that the stop or arrest of the defendant was unlawful. As the Third Circuit stated persuasively in Bowley,

> an alien charged with illegal reentry has no possessory or proprietary interest in his/her immigration file or the documentary evidence contained in that file. Similarly, an alien has no reasonable expectation of privacy in a file that is maintained solely by a government agency for official purposes and kept in the custody of that agency. Accordingly, absent the kind of egregious circumstances referred to in Lopez-Mendoza, we hold that the Fourth Amendment does not provide a basis for an alien to suppress his/her immigration file, or the information in that file.

435 F.3d at 430-31 (internal citations omitted). The Ninth and Fifth Circuits have reached the same conclusion. United States v. Guzman-Bruno, 27 F.3d 420, 421-422 (9th Cir. 1994)("there is no sanction to be applied when an illegal arrest only leads to discovery of the man's identity and that merely leads to the official file or other independent evidence . . . . the district court did not err when it held that neither [the defendant's]

identity nor the records of his previous convictions and deportations could be suppressed as a result of the illegal arrest")(emphasis added); United States v. Roque-Villanueva, 175 F.3d 345, 346 (5th Cir. 1999)(defendant in illegal reentry prosecution not entitled to suppression of INS file because defendant "had no legitimate expectation of privacy in his INS file and therefore no standing to challenge its introduction into evidence")(citing United States v. Pineda-Chinchilla, 712 F.2d 942 5th Cir. 1983)).

Among the Circuits, only the Tenth Circuit has left open the possibility that a defendant's "A-file" may be suppressed as a result of a Fourth Amendment violation. In Olivares-Rangel, the Tenth Circuit held that because in that case law enforcement had used the defendant's fingerprints to obtain his "A-file", if on remand the fingerprints were "determined to be suppressible as fruits of the poisonous tree, then it follows that the A-file should also be suppressed." 458 F.3d at 1121. The only other decision which supports suppression of an "A-file" is a District of New Mexico decision cited by the defendant, United States v. Juarez-Torres, 441 F.Supp.2d 1108 (D.N.M. 2006). Neither this decision nor Olivares-Rangel addresses the compelling point made by the Third Circuit in Bowley: that an alien cannot not have a reasonable expectation of privacy in official records maintained

by a government agency. Indeed, given that the defendant's "A-file" existed prior to his unlawful detention or arrest, and even prior to his engagement in criminal activity, i.e., his illegal reentry, how could it possibly be the "fruit of a poisonous tree"? The government submits that the Third Circuit's decision in Bowley, and the decisions of the Ninth and Fifth Circuits in accord with that opinion, are well-reasoned, and requests that this Court follow the reasoning and holdings of those opinions.

**CONCLUSION**

For the reasons set forth above, the government respectfully requests that the Court deny and dismiss the defendant's motion to suppress.

Respectfully submitted,

UNITED STATES OF AMERICA

By its Attorneys,

ROBERT CLARK CORRENTE
United States Attorney

/s/ Peter F. Neronha
PETER F. NERONHA
Assistant U.S. Attorney
RI Bar No. 5327
U.S. Attorney's Office
50 Kennedy Plaza - 8th Fl.
Providence, RI 02903
Tele: (401) 709-5000
FAX: (401) 709-5001
peter.neronha@usdoj.gov

Dated: November 5, 2007

Certificate of Service

I hereby certify that on the 5th day of November, 2007, I caused a copy of the within "Government's Memorandum Of Law In Opposition To The Defendant's Motion To Suppress" to be served by way of the Electronic Case Filing system upon Edward C. Roy, Esq., counsel for the defendant.

/s/ Peter F. Neronha
PETER F. NERONHA
Assistant U.S. Attorney
RI Bar No. 5327
U.S. Attorney's Office
50 Kennedy Plaza - 8th Fl.
Providence, RI 02903
Tele: (401) 709-5000
FAX: (401) 709-5001
peter.neronha@usdoj.gov